IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LUCY GARZA,

                    Plaintiff,

                                                    Civil No. 05-1814-ST

          v.                                        FINDINGS AND
                                                    RECOMMENDATION
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
_____

STEWART, Magistrate Judge:

          Plaintiff, Lucy Garza ("Garza"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act.  This court has jurisdiction under 42 USC §§ 405(g)

and 1383(c).  The Commissioner's decision should be reversed and remanded for payment of

benefits.

1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Born in 1960, Garza had a tenth grade education when proceedings began.  Tr. 39, 93.[1] From 1983 through 1994, she worked as a core cutter at a paper mill.  Tr. 93.  In 2000 Garza completed her GED.  Tr. 581.

On August 25, 2005, Garza filed an application for DIB, alleging a disability beginning October 1, 1994, due to atypical connective tissue disease stemming from silicone breast implants.  Tr. 39-42.  Her application was later amended to include chronic pulmonary insufficiency and "rheumatoid arthritis and other inflammatory polyarthropathies."  Tr. 43.  On November 18, 2001, Garza returned to work.  She presently seeks benefits for a closed period between her alleged onset date and her return-to-work date (October 1, 1994, through November 18, 2001).  Tr. 30, 621.

After Garza's application was denied, a hearing was held before an ALJ on December 19, 1997.  Tr. 546-67.  On June 26, 1998, ALJ Kingrey found Garza not disabled.  Tr. 376-84.  The Appeals Council remanded the case to the ALJ for consideration of a medical expert's testimony and opinions of state agency evaluating physicians.  Tr. 410-11.  At this point ALJ Kingrey recused herself from the case.  Tr. 572-73.

ALJ Atkins held a supplemental hearing on January 29, 2001, at which he obtained the testimony from a medical expert, Orin Bruton, M.D., a specialist in internal medicine.  Tr. 575-616.  ALJ Atkins then issued a second decision on April 21, 2001, finding Garza impaired by fibromyalgia but again finding her not disabled.  Tr. 455-64.  The Appeals Council again

---

[1] Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer March 27, 2006 (docket # 9), and the Supplemental Transcript filed by the Commissioner on December 28, 2006 (docket # 20).

2 - FINDINGS AND RECOMMENDATION

remanded the case to the ALJ for consideration of nonexertional limitations, evaluation of all

medical sources, evaluation of substantial gainful activity, and resolution of conflicts between

Dictionary of Occupational Titles and vocational expert testimony.  Tr. 474-76.  On September

8, 2004, another hearing was held (Tr. 617-44), and on October 29, 2004, the ALJ issued a third

decision again finding Garza not disabled.   Tr. 27-37.  The Commissioner's decision became

final on November 14, 2005, when the Appeals Council denied review.  Tr. 9-12.  Garza seeks

review of the ALJ's October 2004 decision.

## DISABILITY ANALYSIS

The Commissioner engages in a five step sequential  process in determining disability

under the meaning of the Act.  20 CFR § 404.1520; *Bowen v. Yuckert*, 482 US 137, 140-42

(1987).  Garza challenges the ALJ's evaluation of the evidence and conclusions at step five.

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If so, then the claimant is not disabled.  20 CFR § 404.1520(4)(I).  At step two, the ALJ

determines if the claimant has "a severe medically determinable physical or mental impairment"

that meets the twelve month duration requirement.  20 CFR §§ 404.1509; 404.1520(4)(ii).  If the

claimant does not have such a severe impairment, then she is not disabled.  *Id.*

At step three, the ALJ determines if the severe impairment meets or equals a "listed"

impairment in the regulations.  20 CFR § 404.1520(4)(iii).  If the impairment is determined to

equal a "listed" impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, then the ALJ must first evaluate medical and

other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The

claimant's RFC is an assessment of work-related activities the claimant may still perform on a

regular and continuing basis, despite limitations imposed by her impairments.  20 CFR

§ 404.1520(e), Social Security Ruling ("SSR") 96-8p.  The ALJ uses this information to

determine if the claimant can perform past relevant work at step four.  20 CFR

§ 404.1520(a)(4)(iv).

      If the claimant cannot perform past relevant work, then the ALJ must determine if the

claimant can perform other work in the national economy at step five.  *Yuckert*, 482 US at 142;

*Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999); 20 CFR 404.1520(a)(4)(v).  The initial

burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the

process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the

national economy in the claimant's residual functional capacity.  *Id.*  If the Commissioner meets

this burden, then the claimant is not disabled.  20 CFR § 404.1566.

## THE ALJ'S FINDINGS

      The ALJ found that Garza's fibromyalgia is a severe impairment.  Tr. 36.  However, he

found Garza "not totally credible" regarding her alleged impairments and their impact upon her

ability to work.  *Id.*  As a result, the ALJ assessed Garza's RFC as follows:

> The claimant has the residual functional capacity for light exertion
> as described in exhibit 2[2] with additional limitations stated by the
> medical expert, Dr. Bruton, in testimony given at the January,
> 2001, hearing.  She is restricted to working indoors in an
> environment where she will not be exposed to a lot of dust, fumes,
> strong odors, gases, or poor ventilation.  She is unable to engage in
> repetitive heavy lifting.  She is unable to climb ladders, ropes or
> scaffolds.  Her ability to climb stairs is not restricted.  She can
> occasionally lift up to 20 pounds or frequently lift and carry up to
> 10 pounds.  She is able to stand or walk about six hours in a
> workday and can sit about six hours in a workday.

---

[2] Exhibit 2 reflects the initial determination by Disability Determination Services in 1996 that Garza was not disabled.
Tr. 43-59.

4 - FINDINGS AND RECOMMENDATION

Tr. 36.

Based on this RFC and the testimony of a vocational expert, the ALJ concluded that Garza could not return to her past relevant work, but retains the ability to perform significant work in the national economy, such as light exertion assembly work. Tr. 36-37. The ALJ therefore found Garza not disabled under the Act at any time through the date of his decision. Tr. 37.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r*, 359 F3d 1190, 1193 (9th Cir 2004). This court must weigh "both the evidence that supports and detracts from the Commissioner's conclusion." *Magallanes v. Bowen*, 881 F2d 747, 750 (9th Cir 1989), citing *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The reviewing court "may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Magallanes*, 881 F2d at 750; *see also Batson*, 359 F3d at 1193.

## FINDINGS

Garza contends the ALJ improperly assessed her credibility, rejected her testimony and that of a lay witness, and evaluated medical evidence produced by a two treating physicians. Garza also claims the ALJ failed to properly consider her obesity and made erroneous step five findings.

## I.    Garza's Credibility

5 - FINDINGS AND RECOMMENDATION

In his October 2004 decision, the ALJ found that Garza's "allegations regarding her limitations are not totally credible." Tr. 36.  The ALJ "relied on the testimony of Dr. Bruton [the medical expert] that only 'subjective symptoms' of myalgias/arthralgias are present, and the objective findings consistent with rheumatoid arthritis, connective tissue disorder, or Sjorgren's syndrome as alleged by the claimant are absent." Tr. 31B-32.  He further noted that "there have been some inconsistencies in Ms. Garza's reports of her subjective symptoms and secondary gains may have influenced her allegations." Tr. 32.  The ALJ made no other clearly identifiable credibility finding.

### A.    Credibility Analysis

Once a claimant shows an underlying impairment exists, and there is no evidence of malingering, the ALJ "can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996).  The ALJ's findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995).  In making his credibility findings, the ALJ may consider the claimant's treatment history and observations of physicians regarding symptoms. *Smolen*, 80 F3d at 1284.  The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Id.*  Additionally, the ALJ may employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id*.

### B.    Malingering

6 - FINDINGS AND RECOMMENDATION

Because the ALJ found Garza impaired by fibromyalgia, he was obliged to provide clear and convincing reasons for dismissing her symptom testimony unless he made a finding of malingering. *Smolen*, 80 F3d at 1281-2. Here, the ALJ made no malingering finding.

The ALJ did briefly note that examining physician, Dr. Lynne Bell, referred to a possibly "factitious (self inflicted)" swollen hands. Tr. 32. However, this finding is not supported by the record. Dr. Seldon Keith Saks, a treating physician, consistently noted Garza's hand, finger, and metacarpal joint swelling between September 1998 and an illegible date in 2000. Tr. 427, 429, 430, 431, 435-36, 438. Because the ALJ's reference to Dr. Bell's suggestion is contradicted by the record, it should not be sustained. Furthermore, no other physician who treated Garza has even suggested that she is malingering.

Accordingly, the ALJ was required to provide clear and convincing reasons for rejecting Garza's symptom testimony.

### C.   Medical Record

The ALJ questioned Garza's credibility based upon the testimony of the medical expert, Dr. Bruton. Tr. 31. However, as discussed below, records produced by Garza's treating physicians, Dr. Virgil Peters and Dr. Saks, establish that Garza met diagnostic criteria for chronic fatigue syndrome and fibromyalgia between January 1995 and an illegible date in 2000.

A medical treatment record may be used as one of several factors in illustrating a claimant's credibility regarding her symptoms. *Smolen*, 80 F3d at 1284. Here, it was the only factor used by the ALJ to support his credibility finding. He relied on Dr. Bruton's review of the medical records and also discredited the records of Garza's treating physicians, Drs. Peters and Saks, because "their reported opinions were based on uncritical acceptance of the claimant's

subjective symptoms rather than the objective clinical findings based on medically acceptable clinical and diagnostic techniques. Medical evidence has revealed the claimant is not an entirely reliable historian regarding her activities or symptoms." Tr. 32-33. Although the ALJ briefly mentioned Garza's activities of daily living in discussing her medical records, he did not cite these activities in his credibility finding. Tr. 33.

This credibility determination is not supported by clear and convincing reasons. First, as discussed below, the ALJ erred in his evaluation of the medical evidence. Second, the ALJ engaged in circular reasoning. He first relied upon the medical evidence to discredit Garza and then rejected the medical evidence because Garza is not credible. Because the ALJ did not fairly address Garza's symptom testimony under the proper legal standards, it should be credited. *Smolen*, 80 F3d at 1293.

## II.    <u>Medical Source Statements</u>

Garza asserts that the ALJ failed to appropriately evaluate opinions of two treating physicians, Drs. Peters and Saks. The ALJ "discounted" their "disability opinions, and [gave] greater weight to the assessments reported by the impartial medical expert [Dr. Bruton] and State Agency doctors." Tr. 32. He explained that the opinions of Drs. Peters and Saks "were based on uncritical acceptance of the claimant's subjective symptoms rather the objective clinical findings based on medically acceptable clinical and diagnostic techniques." Tr. 33.

///

### A.    <u>Legal Standard</u>

The opinion of a treating physician is generally accorded greater weight than an opinion by an examining physician. *Edlund*, 253 F3d at 1157. If the opinion of a treating or examining

physician is contradicted, then an ALJ need only set out specific and legitimate reasons supported by substantial evidence. *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005). This evaluation must "set out a detailed and thorough summary of the facts and conflicting clinical evidence." *Magallanes*, 881 F2d at 751. Finally, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F3d 821, 831 (9th Cir 1996).

### B.    Dr. Peters

Dr. Peters, a general practitioner, treated Garza between November 1991 and March 1995. Tr. 132-39. The ALJ offered no detailed discussion of Dr. Peters' records, finding only that the Appeals Council noted that the relevant records show Garza experienced "subjective symptoms of myalgias and/or arthralgias, and dry eyes for several years." Tr. 31.

An ALJ may reject physician reports based upon a claimant's complaints if he has found the claimant not credible. *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001). Here, the ALJ failed to properly discredit Garza, as discussed above. Therefore, this court cannot sustain the ALL's reasoning for discrediting physician opinions incorporating Gaza's subjective complaints.

Dr. Peters' treatment notes document Gaza's fatigue and complaints of a flu-like illness between September 1994 and March 1995. Tr. 135-36. Dr. Peters assessed Garza with a flu and "arthralgia and fatigue." Tr. 136. The ALJ should have considered this assessment in light of Gaza's October 1994 alleged onset date and subsequent records produced by Dr. Saks, discussed next.

9 - FINDINGS AND RECOMMENDATION

C.    **Dr. Saks**

Dr. Saks first evaluated Garza in October 1994.  Tr. 154-58, 160-62.  Garza apparently

visited Dr. Saks in conjunction with joining class action litigation regarding her breast implants.

Tr. 16-61.  At Gaza's initial hearing, ALJ Kingrey expressed open disbelief that such correlation

could be made between Gaza's symptoms and her implants.  Tr. 549-51.  ALJ Atkins later

agreed, explaining:

> that contemplation of participation in class action breast implant
> litigation influenced some of Ms. Gaza's complaints and the
> diagnoses considered by her doctors.  The medical evidence of
> record clearly establishes the claimant is not suffering any
> symptoms or limitations related to silicone breast implants, which
> were completely intact when they were removed from her body in
> 1995.

Tr. 31B.

Such skepticism is understandable.  However,  Dr. Saks continued to treat Garza over a

six year period.  Subsequent treatment notes do not reference breast implant litigation.[3]  Instead,

Dr. Saks' notes are well supported by the appropriate clinical findings and tests.  Between

January 1995 and an illegible date in 2000, Dr. Saks' notes show a consistent diagnosis of

chronic fatigue syndrome with associated myalgias and other symptoms.  Tr. 168-73, 175-76,

178, 180-82, 427, 429-38.  Dr. Saks also found reactive airway disease in October 1994, which

was verified by pulmonary function testing.  Tr. 158, 185.

Dr. Saks' notes establish a longitudinal pattern of chronic fatigue, myalgia, edema, and

fibromyalgia symptoms.  Dr. Saks stated that these conditions rendered Garza unable to work

Tr. 263.  Such ultimate determinations are reserved for the Commissioner, but the ALJ should

---

[3] Dr. Saks suggested implant removal in March 1995.  Tr. 172.  Garza's implants were removed May 30, 1995.
Tr. 145.

have considered this opinion and the supporting materials.  20 CFR §§ 404.1527(d), 404.1527(e).  Because the ALJ did not properly evaluate Dr. Saks' notes under the appropriate legal standards, Dr. Saks' diagnoses and opinion should be credited.  *Lester*, 81 F3d at 834.

Furthermore, an ALJ cannot fault a claimant for visiting a physician at her attorney's suggestion.  "[T]he purpose for which medical records are obtained does not provide a legitimate reason for rejecting them."  *Id* at 832.  In light of Dr. Saks' treatment notes spanning a six year period, this court finds it odd that an ALJ should question Dr. Saks' treating relationship with Garza.  The ALJ's emphasis upon Garza's belief that her illness was caused by breast implants is misplaced.  Regardless of issues concerning causation, the medical record clearly establishes that Garza experienced chronic fatigue and fibromyalgia symptoms, warranting such diagnoses.

### D.    Examining Psychologist

The ALJ's errors with respect to evaluating the opinions of Garza's treating physicians is compounded by his evaluation of the examining psychologist, Dr. Judith Julien, Ph.D.  The ALJ "discounted" Dr. Julien's October 2001 report "after the abbreviated psychological evaluation she performed."  Tr. 31B.  He further explained:

> Neither the testing performed by Dr. Julien, nor prior medical or psychiatric assessment, nor the claimant's lack of treatment, nor the non-medical evidence of record regarding the claimant's cognitive functioning and activities reveals significant limitations of the claimant's ability to perform work activities due to a medically determinable medical impairment.  Moreover, the claimant's demonstrated cognitive and psychological functioning (obtaining a GED in 2000 without difficulty and demonstrated performance of SGA since October 2001) have been inconsistent with Dr. Julien's opinion.

*Id*.

Dr. Julien performed a clinical interview and 20 cognitive tests, including the following:

> Alphabet Forwards and Backwards, Babcock Story Recall,
> Balance, Beck Inventory, Cerebellar, Complex Motor Sequencing,
> Double Alternating Movement, Double Simultaneous Stimulation,
> Hooper Visual Organization, Imitations and Gestures, Line
> Bisection, MCMI-III, Mental Status Examination,  MMPI-2,
> Praxia, Tandem Walk, Tapping, Trail Making A and B, Wechsler
> Adult Intelligence Scale-III modified, Vigilance and WRAT-3
> Reading and Math.

Tr. 486.

Dr. Julien assessed Garza with a cognitive disorder for attention, concentration, mental control, and memory, moderate recurrent major depressive disorder, and suggested a rule out diagnosis of somatization disorder.  Tr. 489.  Dr. Julien found that Garza's pain and fatigue interfered with her cognitive functioning, as identified by the above protocol.  Tr. 491.  Dr. Julien also concluded that, "it is highly unlikely she will be able to work competitively. Whatever she does will need to be limited to a few hours per day with options for rest periods to refresh herself."  *Id.*

The ALJ rejected these findings because "Dr. Julien based her assessment on the claimant's alleged physical symptoms of pain and fatigue, rather than cognitive and psychological findings in her area of expertise."  Tr. 31.  This conclusion is not supported by the record as it does not reflect Dr. Julien's extensive neuropsychological testing.  Although Dr. Julien entitled her report "Abbreviated Neuropsychological Report," it encompasses seven pages of clinical findings, including raw test data.  Tr. 486-92.  Dr. Julien's report is more comprehensive than other psychological assessments of record (*see* Tr. 221-23),  is the only psychological report including comprehensive testing protocol, and, contrary to the ALJ's conclusion, is more than adequately supported by the requisite clinical findings.  *See Bayliss*, 427 F3d at 1216.

12 - FINDINGS AND RECOMMENDATION

In rejecting Dr. Julien's report, the ALJ also noted that Garza earned her GED.  An ALJ may cite daily activities inconsistent with the medical evidence.  *Orteza*, 748 F3d at 750.  While obtaining a GED may justify rejecting a claimant's credibility as to her allegations of impairment, it does not justify outright rejection of an exhaustive and clinically documented medical source opinion.  *See id*; *see also Bayliss*, 427 F3d 1216.

In summary, the ALJ should not have accorded more weight to another examining psychologist's report uncorroborated by testing.  For this reason, Dr. Julien's October 2001 report regarding the period before November 2001 should be credited.  *Lester*, 81 F3d at 834.

**E.    Medical Expert**

The ALJ also relied upon the testimony by the medical expert that only "'subjective symptoms' of myalgias/arthralgias are present, and the objective findings consistent with rheumatoid arthritis, connective tissue disorder, or Sjorgen's syndrome as alleged by the claimant are absent."  Tr. 31B-32.

At Garza's January 2001 hearing, Dr. Bruton began his testimony by saying:

> There's a lot of controversy in the medical literature about fibromyalgia.  I think the bottom line is thought that the most recent experts are [sic] writing on it, Dr. Wolfe [phonetic], who is on the council to look at fibromyalgia a number of years ago, I believe in '98 or '99.  Basically stated that this is not a disabling condition.

Tr. 600.

This statement was wrong.  Fibromyalgia may be a disabling condition under Social Security standards.  SSR 99-2p at *8, *see also Rollins v. Massinari*, 261 F3d 853, 855 (9th Cir 2001).  Dr. Bruton's contrary statement suggests he was not prepared to objectively consider Garza's medical record or symptom testimony.  For this reason, his testimony is suspect.

13 - FINDINGS AND RECOMMENDATION

Furthermore, a nonexamining physician's opinion cannot constitute substantial evidence to reject the opinion by a treating or examining physician. *Lester*, 81 F3d at 831. Thus, the ALJ's reliance on Dr. Bruton's testimony should not be sustained.

**F.    Conclusion**

This court finds that the ALJ did not adequately evaluate the opinions of treating physicians, Drs. Peters and Saks, and the examining psychologist, Dr. Julien. Instead, the ALJ inappropriately relied upon a medical expert, Dr. Bruton, who misstated the applicable standard for Garza's impairment. For these reasons, the opinions of Drs. Peters, Saks, and Julien should be credited.

**III.    Obesity**

Garza submits that she is five feet one inch tall, and respectively weighed 179 pounds and 187 pounds in November 1995 and May 1996. Garza calculates her body mass index ("BMI")[4] at 33.8, calling this figure "well over the threshold for obesity, which is indicated by a BMI of 30 or more." *Id.*

The records of Dr. Saks, a treating physician, repeatedly show that Garza is five feet two inches tall. Tr. 176-178. In contrast, the record cited by Garza is a single pulmonary technician's report. Tr. 195. Because this court credits Dr. Saks' opinion, it will accept his measurements. Dr. Saks' records indicate that Garza's weight fluctuated between 159 and 171 pounds between January and May 1995. Tr. 167, 169-78. Between June 1995 and an illegible

---

[4] BMI is "a formula for determining obesity. It is calculated by dividing a person's weight in kilograms by the square of the person's height in meters." Kenneth N. Anderson et al. eds., *Mosby's Medical, Nursing, & Allied Health Dictionary* (5th ed. 1998).

date in 1999, Garza's weight fluctuated between 172 and 180 pounds.  Tr. 180-81, 431, 433.

These figures encompass BMI values of 29.08-32.92.[5]

These BMI values do not reflect the obesity standard envisioned in SSR 02-01p which

states:

> [T]he [National Institute of Health] Clinical Guidelines describe a
> BMI of 25-29.9 as "overweight" and a BMI of 30.0 or above as
> "obesity."
>
> The Clinical Guidelines recognize three levels of obesity.  Level I
> includes BMIs of 30.0-34.9.  Level II includes BMIs of 35.0 -39.9.
> Level III, termed "extreme" obesity and representing the greatest
> risk for developing obesity-related impairments, includes BMIs
> greater than or equal to 40.  These levels describe the extent of
> obesity but they do not correlate with any specific degree of
> functional loss.

Relevant case law suggests the ALJ erroneously failed to consider obesity when a

claimant had a respective BMI of 44.  *Celaya v. Halter*, 332 F3d 1177, 1179 (9th Cir 2003).  The

court emphasized that such an excessive BMI was well over the Level III "extremely obese"

threshold indicated in the relevant SSR.  Because any obesity exhibited by Garza is classified as

"Level 1," it is not analogous to *Celaya.*  Garza additionally fails to articulate any theory

explaining the impact of her obesity upon her impairments.

For these reasons, this court finds that any omission by the ALJ in discussing Garza's

alleged obesity during the period in question is harmless.  This court will not recommend

reversal for harmless error.  *Burch v. Barnhart*, 400 F3d 676, 679 (9th Cir 2005).

## IV.    Lay Witness Testimony

---

[5]As calculated by NIH guidelines, calculator *available at* http://www.webmd.com/content/tools/1/calc_bmi.htm, last visited January 9, 2006.  This information is consistent with NIH tables, *available at* http://www.nhlbi.nih.gov/guidelines/ obesity/bmi_tbl.htm, last visited January 9, 2006.

Garza contends that the ALJ erred in failing to address activities of daily living reports submitted by her mother-in-law, Tillie Garza.

The ALJ has a duty to consider lay witness testimony. 20 CFR §§ 404.1513(d); 404.1545(a)(3); *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F3d 915, 918-19 (9th Cir 1993). The ALJ may not reject such testimony without comment, unless it is inconsistent with medical evidence. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996); *Lewis*, 236 F3d at 512. If an ALJ rejects lay witness testimony entirely, he must give reasons germane to the witness. *Nguyen*, 100 F3d at 1467.

Omission of lay witness observations of a claimant in a work environment is not harmless. *Stout v. Comm'r*, 454 F3d 1050, 1055-56 (9th Cir 2006). Garza's mother-in-law corroborated Garza's reports concerning her restricted activities of daily living in September 1995. Tr. 107-115. Such testimony reflects Garza's ability to function in the workplace, is consistent with Dr. Saks' opinion, and should be credited.

## V.    <u>The ALJ's Step Five Finding</u>

Garza finally contends the ALJ erred in finding she could perform work in the national economy. Garza suggests the ALJ erroneously found that she could perform light assembly jobs, rather than a specific job with identifiable vocational requirements.

Garza misconstrues the ALJ's conclusions regarding identifiable jobs. At step five, the ALJ cited the testimony by the vocational expert ("VE") that Garza could perform "optical

16 - FINDINGS AND RECOMMENDATION

goods inspector and marker/sorter jobs," as well as indoor, entry level, gatekeeper jobs and "unskilled . . . clean air environment jobs."  Tr. 35.

Furthermore, Garza's counsel did not proffer additional limitations or object to the VE's testimony at the September 2004 hearing.  Tr. 642.  This prevents Garza from raising this issue upon appeal.  "We now hold that, at least when claimant's are represented by counsel, they must raise all issues and evidence at their administrative hearing in order to preserve them on appeal. . . . We will only excuse a failure to comply with this rule when necessary to avoid a manifest injustice."  *Meanel v. Apfel*, 172 F3d 1111, 1115 (9th Cir 1999).  The ALJ's reliance upon the VE's testimony does not suggest such injustice.

Although Garza's contention must be rejected, the ALJ's finding at step five cannot be sustained.  At the September 2004 hearing, the ALJ offered a hypothetical encompassing an individual who would require absence from the workplace "two or more hours a week, at unpredictable times."  Tr. 642.  The VE stated that such an individual would be unable to sustain employment.  *Id.*  Crediting the testimony above establishes that the ALJ should have relied upon this hypothetical scenario in his findings.

///

## VI.    Remand

Because the ALJ failed to give legally sufficient reasons for disregarding the opinions of Drs. Peters, Saks, and Julien, as well as the testimony of Garza and her mother-in-law, those opinions and testimony should be credited.  *See Lester*, 81 F3d at  834.  After crediting those opinions and testimony, no outstanding issues remain to be resolved before determining Garza was disabled within the meaning of the Act during the period in question.  Furthermore, it is

clear from the record that the ALJ would be required to find Garza disabled at step five if the evidence were credited.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000).

A remand for benefits rather than corrective administrative proceedings may be appropriate where the Commissioner's errors have already caused long delay in determining the claim.  *See Kennedy v. Apfel*, 2000 WL 913690 (D Or 2000), citing *Ragland v. Shalala*, 992 F2d 1056, 1060 (10th Cir 1993).  Permitting the Commissioner an opportunity for yet another hearing followed by a fourth decision simply to properly develop the record is not justified.  The repeated failure to appropriately address these opinions convinces this court that further delay to correct administrative proceedings would not be appropriate.  Accordingly, this case should be reversed and remanded for the calculation and award of benefits.

## RECOMMENDATION

For the reasons set forth above, the Commissioner's decision that Garza did not suffer from disability and is not entitled to benefits under Title II of the Social Security Act is not based upon correct legal standards and is not supported by substantial evidence.  Thus, the ALJ's determination that Garza did not suffer from a disability should be reversed and remanded pursuant to sentence four of 42 USC § 405(g) for the calculation and award of benefits.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due by February 9, 2007.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 19th day of January, 2007.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge